630 So.2d 1303 (1994)
Mariano P. QUINONES
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY and Harmony Construction Company, Inc.
No. 93-C-1648.
Supreme Court of Louisiana.
January 14, 1994.
Rehearing Denied February 10, 1994.
*1304 Daniel E. Becnel, Jr., Becnel, Landry & Landry, Reserve, for applicant.
Michael S. Weinberg, Richard L. Edrington, Accardo, Edrington & Golden, La Place, for respondents.
HALL, Justice.[*]
Writs were granted to review a judgment of the court of appeal which reversed a judgment of the district court awarding worker's compensation death benefits. 617 So.2d 124. The primary factual issue is whether the decedent's death was causally related to his on-the-job injury. Finding that the court of appeal correctly determined under the appropriate standard of appellate review that the trial court judgment was clearly wrong, we affirm.

I.
On September 4, 1985, the original plaintiff in this case, Mariano Quinones, suffered an on-the-job injury when a large board fell from a scaffold and struck his left leg. The impact caused severe injuries to his left foot, and he began collecting worker's compensation benefits. The leg never healed properly, *1305 despite an attempt at a skin graft that in itself was largely unsuccessful. As he never returned to work, Quinones received weekly compensation benefits and all of his accident-related medical expenses were defrayed until his death.
On May 6, 1987, Quinones was admitted to the East Jefferson Hospital after a visit to the emergency room. According to his wife and a neighbor, his foot was "black", and was incapable of movement. He died the next day, with the cause of death being listed as adult respiratory distress syndrome as a result of cirrhosis of the liver.
Quinones' wife, Rita, was thereafter substituted as plaintiff in a suit against Quinones' former employer, Harmony Construction Company, Inc., and its worker's compensation insurance carrier, United States Fidelity and Guaranty Company ("U.S.F. & G."). Mrs. Quinones sued for worker's compensation benefits (including funeral and death benefits) and for expenses and attorney fees incurred in her efforts to recover these benefits. The parties eventually agreed to submit the matter on the basis of three depositions and the decedent's medical records. The trial judge accepted this arrangement.
The depositions in question were from two lay persons and one medical expert. One of the depositions was from the decedent's wife and plaintiff in this action. Mrs. Quinones testified that decedent's foot was "dead" at the time of the trip to the emergency room. She also testified that decedent took at least two prescription strength Tylenol tablets for his pain each day. Mrs. Quinones disputed information in a 1982 Charity Hospital emergency room report that stated decedent had been treated for alcoholism. Deponent further disputed an October, 1985 patient history prepared by River Parishes Medical Center that recorded decedent as consuming two to three fifths of vodka per week for the fifteen years prior to the accident. Mrs. Quinones testified that decedent consumed no more than one to three drinks of rum per night.
The other lay testimony came from Betty Roy, a neighbor and close friend of the Quinones family at the time of Mr. Quinones' death. Her testimony consisted of observations that decedent was as "healthy as a horse" prior to the accident, and that, after the accident, decedent's condition steadily worsened. Ms. Roy stated that the swelling and blackness in his foot eventually travelled up to his knee, and that decedent had a "hole" that went to the bone. Ms. Roy testified that she was the one who took the decedent to the hospital on the day before he died, and, while at the hospital, observed "black" blood being pumped from decedent's body prior to his death.
The third deposition came from the only medical expert to testify, a Dr. Steve Nelson, an expert in internal medicine, pulmonary medicine, and critical care. Dr. Nelson reviewed the decedent's hospital records that were made at the time of his last illness, and concluded that these records indicated that the decedent suffered from alcohol-induced cirrhosis of the liver that both caused internal bleeding and prevented the blood from coagulating. This underlying disease eventually led to Mr. Quinones' lungs developing a "filling defect" that culminated in his death from adult respiratory distress syndrome. The medical records showed that Mr. Quinones was admitted with complaints of vomiting blood for several days and feeling "weak". The records also showed indications of blood in the stool, and a markedly decreased blood count. The medical records also indicated that his blood was high in certain chemicals that were usually cleared by the liver, and low in coagulants that were usually produced by the liver. Finally, the records showed that there were dilated veins in the esophagus and that there were blood clots in the stomach, maladies that, in Dr. Nelson's opinion, were quite common in patients with alcohol-induced cirrhosis of the liver. The records also noted Mr. Quinones' previous leg injury and skin graft, but noted no infection or abnormality.
Dr. Nelson did note that Mr. Quinones was suffering from some form of infection and was septic, but nowhere in the records could he find evidence of where the infection was located. Further, no infection at the site of the leg injury was noted by any of the treating physicians, including the physician who performed the autopsy. Dr. Nelson opined *1306 that, although it was possible to develop an infection in a skin graft years after the graft, it was also possible that the infection was located in the decedent's upper airway or sinuses.
During cross-examination, Dr. Nelson did admit that Tylenol, in conjunction with Vitamin C, could cause cirrhosis of the liver similar to the decedent's, but was quick to point out that this phenomenon would require massive doses far in excess of what the decedent took for his pain. Dr. Nelson's final summation was that Mr. Quinones' death in 1987 was completely unrelated to his 1985 on-the-job injury.
The trial court took the matter under advisement, and rendered judgment in favor of plaintiff. The lower court had some difficulty in accepting the testimony of Dr. Nelson, as he was not the treating physician. Further, the trial court noted that Dr. Nelson did agree with plaintiff in that many factors, including the injury with its resultant infections and medications, contributed to the defendant's demise. The trial court also noted that autopsy slides that would have been definitive on the issue of alcoholism were not in the record. All of this uncertainty created an atmosphere where reasonable minds could differ as to the cause of death, and, in this case, the trial court's conclusion as to the cause of death differed from that of Dr. Nelson. Judgment was rendered, awarding death benefits, funeral expenses, medical expenses, and assessing penalties and attorney fees to U.S.F. & G. for its failure to pay same.
Defendant appealed, and the judgment was reversed. Quinones v. U.S. Fidelity and Guaranty Co., et al., 617 So.2d 124 (La.App. 5th Cir.1993). The court of appeal, citing Hammond v. Fidelity & Cas. Co. of New York, 419 So.2d 829 (La.1982), noted that the plaintiff in a death benefits case bears the burden of proving, by a reasonable preponderance of the evidence, that a causal relationship existed between the employment accident and the death. The court of appeal found that the plaintiff in the instant case did not carry this burden. Plaintiff's sole evidence consisted of her own and a close friend's observations about the decedent's injury, his condition on the day of his death, and the injury's impact upon his condition. The court of appeal held that the testimony failed to establish, in any logical or legal fashion, that the injury, as opposed to alcoholism, had a causal relation to the death. As plaintiff failed to prove that benefits were owed, the court of appeal found that attorney fees and expenses were not owed for the nonpayment of benefits. The end result was that the court of appeal reversed the trial court judgment in its entirety. Plaintiff applied for a writ of certiorari to this court, and the writ was granted. Quinones v. United States Fidelity and Guaranty Co., et al., 625 So.2d 1024 (La.1993).
Plaintiff/Appellant claims that the court of appeal erred in its determination that Mr. Quinones' injury did not contribute to his death. Plaintiff/appellant takes issue with the court of appeal's undue reliance upon the expert testimony of Dr. Nelson as the basis for its upsetting the trial court's finding of fact that the leg injury, as opposed to alcoholism, was shown to be a cause of Mr. Quinones' demise. She points out that Dr. Nelson never actually examined the decedent, instead relying upon information contained in decedent's medical reports compiled at the time of his last illness. In the event that this court does consider Dr. Nelson's testimony to be sufficiently reliable so as to constitute a valid basis for judgment, appellant believes that the testimony bolsters her case. Appellant draws our attention to admissions made by Dr. Nelson in his deposition, namely that there was a possibility that the prior infections and injuries suffered by Mr. Quinones had some connection with the death. After consideration of these arguments and all of the relevant evidence, we affirm the court of appeal.

II.
Dependents of an injured employee are entitled to receive benefits for any injury that arises in the course and scope of employment that results in the death of the employee. LSA-R.S. 23:1031; LSA-R.S. 23:1231. In a worker's compensation case, the plaintiff/injured employee bears the initial "burden of establishing the causal connection *1307 between the disability and the employment accident by a reasonable preponderance of the evidence." Hammond v. Fidelity & Cas. Co. of N.Y., 419 So.2d 829, 831 (La.1982); Prim v. City of Shreveport, 297 So.2d 421, 422 (La.1974). It is not necessary for the plaintiff to establish the exact cause of the disability, or, in this case, the death, but it is necessary for the plaintiff to "demonstrate by a preponderance of proof that the accident [that was] sustained has [a] causal relationship with [the] disability." Russell v. Employer's Mutual Liability Insurance Co. of Wisconsin, 246 La. 1012, 169 So.2d 82, 88 (La.1964). This causal relationship can be demonstrated, creating a presumption that the accident caused the disability, when an employee proves that
before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324 (La.1985). The establishment of this causal relationship serves to create a legal presumption that the injury caused the disability. Id. After an employee successfully "establishes the presumption of a causal relationship, the party denying the existence of a presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue." Id., at 325. This presumption is not rebutted by the mere introduction of contrary testimony, as rebuttal in this instance requires more:
The effect of the presumption is not so slight and evanescent that it is spent and disappears upon the mere production of evidence by the adversary. It is a true presumption that has been created for policy reasons that are similar to and just as strong as those that underlie the compensation principle itself....
Id. Thus, it falls upon this court to determine whether or not the court of appeal erred in its holding that the trial court was incorrect in its finding that plaintiff carried this initial burden.
Louisiana Const. Art. V, § 10(B) (1974) provides that
Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.
This vesting of authority in the court of appeal to upset trial court findings of fact is not without limit. Before a court of appeal can set aside a finding of fact made by a trial court, the finding by the trial court must be "manifestly erroneous" or "clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). This requires a review of the record in its entirety, and, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where the testimony of witnesses is in conflict,
reasonable evaluations of credibility and reasonable evaluations of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). It is clear that these precepts bar review of a trial court finding of fact unless it is based upon an "[im]permissible view of the evidence." In the instant case, the issue is whether the trial court based its finding that Mr. Quinones' death was "causally related" to the employment injury on an "[im]permissible view" of the evidence before it.
The focus of this inquiry should be whether or not the trial court was correct in effectively ignoring the expert opinion in this case and concentrating only upon the lay testimony of the decedent's wife and neighbor. This court, in Domino v. Domino, 99 So.2d 328, 330 (La.1957), stated that
[i]t is well-settled that the testimony of each witness qualified and accepted as an expert should be given effect if and when it appears to be well-grounded from the standpoint of sincerity and common sense. *1308 This determination of an expert's opinion being "well-grounded" involves determining that the expert was qualified and experienced, that the opinion was conscientiously formed, and that the expert explained in some detail the manner in which the opinion was made. See Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541, 543 (La.1954).
In the instant case, Dr. Nelson was board certified in critical care, pulmonary care, and internal medicine. The opinion was formed after careful examination of records relating to the decedent's last days and final illness, namely the information recorded by the treating physicians in the emergency room. The use of these records as a source of information for the symptoms was an acceptable use of other experts' compilation of facts (as opposed to a restatement of their opinions) as a valid basis for Dr. Nelson's opinion. See State v. Chapman, 410 So.2d 689, 704 (La.1981). In his deposition, Dr. Nelson explained the nature of each symptom of the decedent and how the symptom could relate to alcohol-induced liver damage. Dr. Nelson also opined that the area surrounding the leg injury was without infection, and explained that, were infection present in that area, there would be external indicia of infection. Dr. Nelson also remarked that no references to these indicia of infection were present in any of the materials that he consulted. Throughout his deposition, Dr. Nelson explained how each symptom and the results of each test militated against both a finding that there was an infection due to the leg injury, and against a finding that, if there were such an infection, that such an infection would be "causally linked" to Mr. Quinones' death. Thus, as Dr. Nelson's opinion appears to satisfy Domino`s requirements for being well-grounded, the trial court should have accepted it and given it effect.
Whether the trial court should have given the expert testimony more weight than the contrary lay testimony is another matter. This court, in Middle Tennessee Council, Inc. v. Ford, 274 So.2d 173, 177 (La.1973), stated that
[t]he weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. However, the sincerity and honesty of the opinions expressed are matters in which the trial judge is in a particularly advantageous position to determine. It is, in effect, a question of credibility, and when the experts are widely disparate in their conclusions, the rule has special relevance.
As there was no other expert testimony competing for the trial judge's attention in his credibility determinations, we must consider whether or not the lay testimony presented was more credible on the issue of the cause of decedent's death.
This court has held that expert medical testimony "must be weighed in the light of other credible evidence of a nonmedical character, such as a sequence of symptoms or events in order to judicially determine probability." Schouest v. J. Ray McDermott & Co., 411 So.2d 1042, 1044-45 (La.1982). In the instant case, the testimony of the lay witnesses consisted of "observations" that the injured foot was "black", "dead", and that "black blood" was drained from other parts of the decedent's body. These witnesses had no medical knowledge that would make their opinions as to medical phenomena helpful to a finder of fact. There were no statements from these lay witnesses as to a series of events that could, from a reasonable person's perspective, logically show some link between the foot injury and the death, and, by so doing, establish the presumption recognized in Walton, supra. As this court set out in Rosell, supra,
Where documents or objective evidence so contradicts the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness' story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based on a credibility determination.
549 So.2d at 844. Here, the "documents" in question (decedent's medical records compiled at the time of his last illness) showed no infection, and the carefully-considered medical expert opinion clearly outweighed the lay witnesses' speculation as to the cause of the *1309 death. Thus, the court of appeal was correct in holding that no reasonable fact finder would give more weight to the lay testimony than to the medical expert testimony in this case.
Alternatively, plaintiff/appellant claims that certain admissions made by Dr. Nelson in his deposition testimony serve to establish the presumption-creating causal link between the injury and the death. She draws especial attention to Dr. Nelson's statements that there was a possibility that the prior infections, combined with other factors, caused or accelerated Mr. Quinones' demise, and she also draws our attention to the possibility that Mr. Quinones' pain medication for the injury caused the liver damage in question. First, it seems obvious that an expert's acknowledgment of a mere "possibility" of some synergistic effect of prior infections or medications upon a decedent is not enough, even when coupled with speculative lay testimony, to satisfy a preponderance standard. Finally, Dr. Nelson pointed out that, in order to cause the liver damage in question, the medication (prescription-strength Tylenol) would have to be administered in dosages far in excess of what the plaintiff actually consumed.
As the testimony of the lay witnesses and the expert fails to establish any causal link between the on-the-job injury and the death, the court of appeal was correct in determining that plaintiff/appellant failed to carry her burden of proof in her action to recover death benefits. The trial court's judgment to the contrary was clearly wrong.
As the benefits were never owed to the plaintiff/appellant, it follows that their nonpayment did not subject defendant to penalties under LSA-R.S. 23:1201(E).

III.
The court of appeal's constitutional exercised within the constraints of the "manifestly power and duty to review facts must be erroneous" and "clearly wrong" doctrine, as the appellate courts'" function is not to decide factual issues de novo." Rosell, supra, at 844, citing Maraist, "The Work of the Louisiana Appellate Courts for the 1978-1979 Term-A Faculty Symposium, Civil Procedure," 40 La.L.Rev. 761, 764 (1980). In this case, the court of appeal used this power properly to correct a trial court judgment that was clearly wrong. Thus, the judgment of the court of appeal, which entered judgment in favor of U.S.F. & G dismissing Mrs. Quinones' suit at her cost, is affirmed.
AFFIRMED.
CALOGERO, C.J., dissents and assigns reasons and would grant rehearing.
DENNIS and ORTIQUE, JJ., dissent with reasons and would grant rehearing.
CALOGERO, Chief Justice, dissenting.
The finding of the trial judge and the consequent judgment in favor of plaintiff was neither manifestly erroneous nor clearly wrong.
ORTIQUE, Justice, dissenting.
To effectuate the humane policies embraced by our Worker's Compensation Act, its laws must be liberally construed in favor of the injured employee or, as in this case, the surviving spouse of the injured employee. See Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La.1993). See also Lester v. Southern Cas. Ins. Co., 466 So.2d 25 (La. 1985). This court and the court of appeal did not give proper deference to this presumption of liberal construction. Nor did they give proper deference to the trial court's findings of fact, evaluations of credibility or assessment of weight of live testimony, as previous edicts of this court require. See Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990). The trial court rendered judgment in favor of the injured employee's surviving spouse. It did not manifestly err.
The trial court's judgment was untainted by provincial prejudice against those who are publicly known to excessively imbibe. The appellate court reached a speculative conclusion despite a woeful lack of evidence that alcohol had destroyed Mr. Quinones' immune system, making his death on May 7, 1987 inevitable, even if he had never suffered the debilitating work related accident which resulted in the putrefication of his left foot and leg. Au contraire, in my view, the evidence *1310 leads to the inescapable and rational conclusion that the putrescent foot and leg contributed in some measure to Mr. Quinones' untimely death.
Therefore, I respectfully dissent from the judgment of this court which affirms the reversal of the trial court's judgment.
NOTES
[*] Watson, J., not on panel. For the procedure employed in assigning cases after January 1, 1993 to rotating panels of seven justices, see State v. Barras, 615 So.2d 285, 286 n. 1 (La. 1993).